Good morning, Your Honors. May it please the Court and the Council, I'm Mark Silversmith for Petitioner-Appellant Adelmo Beltran. And I want to start off reviewing my brief last night. I noticed that I had confused in a couple places the citation for the Kelly-Endo v. Warden case. In the supplemental reply brief, I had occasionally cited to the superseded opinion. There was two opinions close in time, and I apologize for that if the Court needs me to clear that up in a formal pleading. I'd be happy to do that. I hope that this argument is engaging as the one about the lightbulb discounts. We hear so much about dope and murder and things like that. Hearing about lightbulb discounts, nice variety. It's nice. I'm going to go back to dope, I guess. What the State is asking in this case is for the Court actually to go out on a limb, to hold either that there was no constitutional violation at all when extrinsic material is sent into the jury room because of its source. That's a unique, the only precedent in that is the unique case law from California. And the other thing they're asking to go out on a limb on is to find harmless in a case where the extrinsic material relates directly to a material aspect of the case and also deals with past misconduct by the defendants at issue. Counsel, California law is really different from Federal law in this. It uses different words, different categories, and different tests. And that, let's see, am I remembering right, this is State habeas? This is a State habeas case. So it's just a matter of Federal constitutional law. That's right. And Supreme Court law. Right. And what we've got here is extrinsic evidence. The jury gets search warrant affidavits they were never supposed to get. They were specifically excluded from the trial. So we're not talking here about juror misconduct. We're not talking about what one juror said to another where California law is radically different from Federal law. Right. We're talking about extrinsic evidence that came in. Right. If I remember correctly, we have a test on that that says that the government has to prove, and I can't remember exactly how high the standard is, but the government has to prove it did no harm. But I'm not sure how to reconcile that with the 2254 and BRICT analysis that usually apply on State habeas. Well, a direct review in a Federal case, the standard would either be. . . Well, California law says it's ordinary. Ordinary error. Error as opposed to constitutional error. And that's contrary to Supreme Court precedent. That's contrary to Federal law. So we. . . In a direct review case, this Court would be looking. . . Well, tell me why that's contrary. Because they're not finding it harmless beyond a reasonable doubt, which is constitutional error is set forth in the opinions in Parker v. Gladden, Turner v. Louisiana, and every circuit case after that that's ever dealt with the issue of extrinsic evidence. So it's contrary to California law. . . to Federal Supreme Court law because they did not consider this to be constitutional error and did not apply the Chapman test. So if this Court were looking at this case on direct review, it would either say it's a rebuttable, it's a presumed prejudice that the State has to disprove, or the State has to prove it harmless beyond a reasonable doubt. Now, we're on State habeas, so the BRICT standard does come in. We can see that although there's a circuit split, this Court follows the majority of the circuits that says that we apply the BRICT standard even if the State court did not do that. So this Court has to question whether the State can provide the Court a fair assurance that it did not have a substantial and injurious effect on the verdict under the BRICT standard. And no court, so that it's examined this, has found that the State's been able to do that. Well, now you rely heavily on Caliendo, correct? I do. But what I'm seeing there is that I'm not sure that that contradicts the California court's analysis because the Caliendo holding involves and explicitly discusses communications between jurors and a witness and entrusted parties, correct? And so as far as, you know, I'm putting this out to you to respond to, it seems that this is exactly the extrinsic evidence that California courts agrees compels a presumption of prejudice. And Caliendo does not address what occurred here when a jury innocently considers evidence that was mistakenly given to them. And, you know, obviously that this is what California calls ordinary error. That's... And correct me if I'm wrong on the facts, too. My understanding is that the jury is the one that called this attention to everyone, that if the jury hadn't said, hey, are we supposed to be looking at this, no one would have ever known about it. Well, I don't know what would have happened after trial. Well, I mean, we don't know, but that's how it came to the attention. That is how it came to the attention. And so you kind of have to consider that, too, if you get to the point whether a curative instruction would work, because they're the ones that say, hey, are we supposed to be looking at this? And then the court asks all of them, can you disregard this? And they say yes. You posed about six questions. Right. I mean, but that's kind of my thought process. Well, okay. I'm looking at all of that. With due respect, I think the court is looking at this. I would respectfully say that the California courts in not applying the Chapman test and not finding constitutional error, that's clearly wrong. I mean, even the state's initial brief before counsel was appointed, they admitted that this was constitutional error, and they cited Lawson and all the Sixth Amendment precedents, including eslaminia, which was also a case of inadvertent, extrinsic evidence inadvertently being sent to the jury. So I think you're clearly on solid grounds in saying that the California case decision on this point is contrary to clearly established federal law. It didn't follow any of the Supreme Court cases, including Parker v. Glenn, Turner v. Louisiana, and you look at all the cases since then, including the Sixth Circuit case, which said this is clearly established federal law, that extrinsic evidence exposure to the jury is a Sixth Amendment violation. You have to find if it's harmless. The court asked a lot of questions about whether it's harmless. The fact that the jury did bring it to the court's attention and there was a curative instruction are factors which this court can consider under the catch-all factor in Lawson, which was later expounded upon in Jeffries. But no court that I'm aware of has ever found evidence, extrinsic evidence, that directly relates to a material issue that deals with the prior misconduct of the defendants to be harmless. I mean, it's really mental gymnastics to say that the jury is going to disregard this evidence. The jury deliberations in this case were a full day, so it was not a slam-dunk as far as... I wanted to ask you about the slam-dunk aspect. No matter how egregious the extrinsic evidence is, if the case is enough of a slam-dunk, I would think it wouldn't matter. There are cases, say, if it's overwhelming evidence, no court... Why isn't this case such a case? Because no court's case has found that. There was a clear credibility issue. If you believe Ramon Beltran's testimony, and I'm running into some time. I'd like to reserve some time to rebuttal, and I'd like to answer the court. I thought it was something else. He thought it was something else. He thought it was black powder. If you believe him... Because he didn't deny what they saw and that the panels were found in there and that they got it there. That's right. That's right. And he was the main defense witness for Adelmo. Adelmo had... Was there anything to make that black powder explanation believable? Well, the state's own rebuttal expert said that there is a black powder, and it is illegal, and it is dangerous. I mean, the state's own rebuttal witness actually, I think, helps the defense. Some firework stealer who testified, oh, yeah, I was talking to him about black powder. If somebody... No, there was not that. That's the... I mean, the government makes much of the misdirects. The fact that the defense did not present that person. And obviously that person would have a strong incentive not to make themselves available for testimony, having apparently provided 10 kilograms of cocaine to these people. But... Here's my problem. The defense seems like kind of a joke to me. I can't imagine anybody believing it without some strong corroboration. But the extrinsic evidence seems kind of outrageous to me. Well... I don't understand why the prosecutor didn't just give the clerk Xerox copies of the face page instead of counting on the clerk to do his work for him and make the Xeroxes and not give the jury the attached affidavits. It's beyond belief to me that the affidavits went into the jury room. But because the defense seems like such a joke, it's hard really to know how to deal with the prejudice aspect. Well, the question is, I mean, you look at Gibson v. Klan, and they said the case against Gibson and Justice is a strong case. I mean, this is a strong circumstantial evidence case. I mean, they caught them with the drugs, and the question is, what did they think it was? Did they know what it was? I mean, that's an element that the prosecution has to prove, and we can't put ourselves in the position of the jurors. The juries were entitled to believe Ramon Beltran. It seems like a comedy routine. What did you think all that white powder you were hiding in the doors was? Sugar, sugar. It must have been sugar. Well, it couldn't have been sugar. You wouldn't have to hide it. You could put it on a back seat. Oh, it must have been something illegal. Black powder. That's it. I mean, it's hard to take seriously. Well, I mean, we're a bit jaded. But the question, first of all, they didn't see the black powder. Apparently it came wrapped. They were told it was something, you know, obviously it's a shady dealing. But they didn't want to – what Ramon Beltran said is he didn't want to get deported, and he never would have transported drugs if he knew he was going to get deported, and he didn't believe this was drugs. That jury is entitled to believe that. And if you look at some of the cases where, you know, Gibson v. Kline are a very strong case. I mean, is this more reason to think they might have believed it had it not been for the affidavits slipping in? Well, they spent a full day deliberating it. If, you know, if they came back in 15 minutes and said this is a crock, I mean, it's really – How long did they spend deliberating? I believe it was from 9, almost 10 in the morning until 4.30 in the afternoon. So really a full day. Yeah. How much time was spent wadeering on the fiasco? I'm sorry, I would have to go back to the record. I don't have that at the tip of my tongue. Remember? I don't. But if you look at the – I mean, the Eslamini v. White, which is the extrinsic evidence of the tape with the wrong side, a very similar case that's accidentally sent to the jury, and that's the Billionaire Boys case. And you look at their defense. I mean, Ben Dostey's defense was, I was asleep when Joe Hunt went to kidnap Heday at Eslamini and I thought that he was agreeing to be kidnapped. And that was Ray Eslamini's defense, too. He thought that his father was agreeing to be kidnapped by these people to get him out of trouble. I just have one quick question. Let's assume prejudice and then go to the next level, whether the instruction, you know, and apply the tests that you want. Is there any established supreme – well, California law obviously says that you can cure an error with a curative instruction in certain – and this appears to be an alternative showing here. And I think the Supreme Court's made clear that you can – that there are times when an error may cure a jury instruction. What Supreme Court case can you point me to that says that you can't cure an error with an instruction? You can cure some errors with an instruction. I mean, that is clear. And that is a factor that this Court has recognized may be a factor in assessing prejudice. The only question is this Court has repeatedly said curative instructions are not particularly helpful. We need Supreme Court law. Judge Callahan asked you for Supreme Court law. There's no Supreme Court law on – I mean, there's only, I mean, really two major cases about extrinsic evidence in the jury room. And those did not have a curative instruction. There is Marshall v. United States, which is a supervisory power, and which in a certain extent on the prejudice question, it doesn't matter whether it's under the supervisory power or under the constitutional power because it's a question of prejudice. And that case said you can't expect the jury to follow that instruction, and it's going to be prejudicial anyway. So Marshall v. United States is the best answer. I mean, there's Bates v. Preble, which is a civil case from the 1800s, which I think is also illustrative of the point in which the Court said, don't look at these pages of this book. And the Supreme Court said, no, that's ridiculous. But if you look at the circuit cases, and you don't have to have Supreme Court authority under the AEDPA on the prejudice issue, what this Court said in Caliendo is we review that de novo and we don't defer. And all the circuit authority says that in a case where you're talking about prior misconduct or prior crimes, the curative instruction doesn't have much use. And there isn't any case where this Court has found it harmless to have this kind of directly material evidence that relates to a material fact that deals with past misconduct by the defendants, where the Court has found that the State has been able to meet its burden. There's no case. Thank you, Counsel. Good morning. Gregory Ott for the State Warden. I would define the issues that I raise a little differently. On the issue of error, what this boils down to is a 2254 question. We do not propose that this is not jury misconduct simply because of a source. The question is rather whether there is clearly established Supreme Court authority that would indicate that the path that the Court of Appeal took was unreasonable. And when you survey the Supreme Court cases that have been raised, they're substantially distinguishable. Counsel, I've got to say this is about as outrageous an extrinsic evidence injection as I've seen. Usually it's something trivial, like somebody looked at a dictionary. Here they actually have the search warrant affidavits saying the guy's a dope dealer. It's really something. Which goes right to the heart of his defense. Yeah, I agree. The whole case. Because if you're a dope dealer, you know what dope is, as opposed to fireworks. It's beyond belief to me that the prosecutor let this happen. I know that it was blamed on the clerk of court in one of the papers here. But, gee, clerk of court would never have gotten anything from most lawyers that shouldn't go to the jury. So considering that there are some Supreme Court cases that are pretty strong on extrinsic evidence, it seems to me you have an uphill battle despite the 2254 standard. Well, I think that whether we evaluate it as due process error and wrongfully admitting evidence or juror misconduct. Well, it's not juror misconduct. They didn't do anything wrong. The prosecutor did. Right. Well, I disagree with the prosecutor's fault. California uses the term a little funny. But the California Court of Appeal correctly said they use the term more broadly than most other states and the feds do. But the California Court of Appeal correctly said it's not juror misconduct, it's clerk misconduct. Right. And to the extent that the DA accidentally or inadvertently gave those, if he did, to the clerk, then he did screw up. But there has never been a suggestion until the reply brief here that that was prosecutorial misconduct. But in any event, that's not the point. It's not litigated as prosecutorial misconduct. Right. The affidavits were damning. We've conceded that. They did go to the heart of the defense. Why should I believe that they didn't matter? Well, we've got this jury question that came out of the jury room, how should we use the affidavit. That suggests to me that they're thinking and talking about the affidavit. Well, it cuts both ways. As I pointed out in my brief, it also suggests that they're careful about what they're looking at. They recognize that it wasn't admitted because they came out and asked. And it also suggests that they weren't going to consider it without the court's okay. Well, then the judge tells them, don't consider it. It got to you by mistake. Generally, where the courts have held that an admonition eliminates the problem, it's been in cases, as appellant's counsel said, where evidence is admissible for a limited purpose, inadmissible for other purposes. The judge admonishes the jury to consider it only for the limited purpose. So the appellate courts say that's okay. True. But here, there was no way that this was admissible. It just shouldn't have been there. That's correct. But I think that that also cuts both ways. If you've got something coming in for an admissible purpose, I think the line is a little more gray. One of the cases cited in the brief was where a co-defendant's confession was admitted, but they were told to not consider that as to this defendant. That's damning and obviously directly goes to the heart of that case. And they said that a limiting. And it really troubled the Supreme Court. That's why that line of Bruton authority has come down. But they did find that that could be cured with an instruction. And there was more than an instruction here. The judge took each juror into chambers, polled them, had a face-to-face assessment of their credibility when they said, I will not consider it and I can evaluate the evidence, and putting that aside. At that point, you're asking each of the 12 jurors to say, okay, I will pretend to believe this nonsense that the defendant fed me, as opposed to what obviously is true and what the affidavit supports, since I'm not allowed to consider the affidavit. Well, that's one way to look at it, although that's the case whenever a judge tells a jury to limit its consideration. It has to compartmentalize the evidence that happens in so many contexts. What can you tell us about the time here in terms of, you know, they deliberated, they obviously come back with a question saying, are we supposed to be looking at this? And then it obviously takes time to have each person come in one at a time. I think there was a motion for mistrial, too, which the court held. And so do you have, does the record include a timeline of all of that? I don't know off the top of my head. I'd have to look at the CT. Often the CT will have in the minutes the time when the jury comes back. I don't know if it does in this case. Well, but usually a jury question has time or usually go back on the record, you know, or, you know, characteristically, counsel would meet with the lawyers in chambers and say, I have a question from the foreperson, the question reads such and such and such, and this is what I'm proposing doing. It does usually, and honestly I can't remember if the CT contains that. We did admit the CT in district court as an exhibit. What's the CT? I'm sorry, the clerk's transcript, the whole clerk's transcript, which should have minutes in routinely from past experience, has times when the jury comes back and goes back in, goes to lunch, and you can sort of parse out the timeline. I would point out just generally that this was a three-defendant case with a substantial amount of evidence, a substantial amount of foundation testimony setting forth the whole investigation and the car ride back forth, the subsequent searches. So there was a lot of evidence. And I don't think a day of deliberations is significant in light of that, especially with three defendants to evaluate. But even though the affidavits were damning, we agree with that. When you look at the totality, the instructions and my backup or sidetrack here, the evidence here was overwhelming. These defendants chose this defense to the extent that they adopted Ramon's testimony because it was the only defense they had. They were caught. They were caught. They were surveilled. They did not attempt to dispute any of that. Was there anything to back up the black powder theory? Did they have any kind of corroboration for it? No. The only argument was that this could be reconciled with black powder as well as cocaine. Now, that in itself I don't believe was believable. Have any witnesses or anything, including them, did anyone testify? Did the defendants testify? Only one defendant testified, Ramon Beltran. At Delmo, the appellant here did not testify. The only evidence our appellant proffered in his defense was the rent receipt evidence. That evidence, I think, did more harm than good for him. His common-law wife got on the stand and brought rent receipts that were fabricated, falsified. She purported to claim that she remembered more than a year ago that the porch light was out, for whatever strength that gave, I guess implying that the officers couldn't have seen what they saw. Was there any corroboration from anyone other than the one defendant who testified about the black powder theory? No. I think there was a statement by the common-law wife that she had never seen drugs in the house. But I think your appellant's counsel said something about, like a DOJ expert on cross-examination, that there was testimony elicited to the extent of, yeah, the way that that looks, it could be. . . I mean, it doesn't have to be witnesses that they called. Did they elicit any witnesses from. . . He mentioned an expert. Right. That would support their theory of defense on some level, whether you believe it or not. That was a prosecution rebuttal expert. And what he testified to was basically, the reason he was brought on was to say this black powder defense, the suggestion that you had to go to L.A. and get this shipment of black powder and bring it up, he's essentially saying black powder you can get pretty much anywhere. The idea that these guys would traffic it from L.A. and hide it in their compartments was basically frivolous. The point was black powder is freely available anywhere. And the reason he was brought on was basically to say that. He did not testify that these packages look like black powder. I don't recall anything like that. Whether an appellant can argue what inferences, he can. But the point of his testimony and the substance of his testimony was that this stuff is available anywhere. Is the kind of black powder. . . He probably testified to this, but I didn't read the transcript. Is the kind of black powder that they claim to be smuggling, the kind for fireworks, is that the same stuff that you buy in a gun store if you use those replica guns, black powder guns? I don't know, Your Honor. I know gun stores, they sell powder if you load your own ammo. Right. For contemporary guns. And some people use replica guns that have black powder and a wad and a ball. And I'm wondering if it's the same black powder. I don't know. I do know that Ramone's testimony was that this was the type or for use in fireworks. But I don't know if that's the same. I don't know if that's the same. AT&F agent didn't testify to that? No. I was thinking he might have said whether you could get it in any gun store. If he did, I don't recall. I don't recall him saying that. I probably wouldn't have been asked if none of the prosecutors ever went to gun stores. I see I've run out of time. I'd be happy to answer additional questions if the Court has any. Thank you, Counsel. Thank you. You went way over time, but take 60 seconds. All right. In answer to Judge Callahan's question, it looks like the jury, at least if you look at the people's excerpt of record, at 1146 they came back, the Court went back on the record, and then at 1217 the bailiff indicates that the jury is still in there. So it looks like there's about a half an hour discussion of the affidavit issue and less of that time was actually with the jury in the room. Some of it they'd been sent back into the jury room. So that took about half an hour out of the 10 to 5.07 deliberation time. With respect to what my opponent just said, if you concede that this is damning evidence and it is outrageous, I think you've pretty much lost the case under the law. The only question that this Court has to answer is can they prove that it was harmless? Can they disprove prejudice? They have to give this Court a fair assurance. And if you concede it's damning, it's outrageous, this is not the strongest defense in the world, clearly, because they were not acquitted. We don't see a lot of strong defenses because you don't get appeals and acquittals. But they didn't argue alibi. It wasn't a question of were they there. It was a question of what did they know. And they had one witness who the jury was entitled to believe. And I know Judge Canahan tried a lot of cases where the testimony of one witness in California is sufficient to prove any point. They could have believed Ramon. This killed the case for them. And the people conceded that. So there's no case that finds this kind of evidence harmless. There's no case that finds that the State can meet its burden of proving harmlessness on this kind of outrageous and damning evidence, which the State concedes it is. So I think it's a tragedy in a number of ways, and it should have been corrected at the beginning by a mistrial. But I think at this point this Court has no choice but to grant the writ. Thank you, counsel. Thank you, Your Honors. Spell crayon v. Knowles is submitted. We'll hear Barnes v. Terhun.
judges: Oakes , Kleinfeld, Callahan